UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

KRISHAN NAGDA, M.D., an individual,

        Plaintiff,

v.

DROWL HEALTH TECHNOLOGIES,
LLC, a Delaware limited liability
company,

        Defendant.
_____/

Case No.:

# COMPLAINT

Plaintiff, Krishan Nagda, M.D. ("Nagda"), sues Defendant, DrOwl Health Technologies, LLC ("DrOwl") and, in support, alleges as follows:

### JURISDICTION, PARTIES, AND VENUE

1. This is an action brought by Nagda against DrOwl for breach of contract, unpaid wages, unjust enrichment, conversion, other equitable relief, damages, costs and attorneys' fees, resulting from DrOwl's breach of an employment agreement and other conduct as described herein.

2. This Court has subject-matter jurisdiction over this action under 28 U.S.C. § 1332(a) because the parties are citizens of different states and the amount in controversy exceeds $75,000, exclusive of interest, attorney's fees, and costs.

3. Nagda is an individual, residing in Seminole County, Florida.

4. DrOwl is a Delaware limited liability company with its primary place of business in Bernalillo County, New Mexico.

5. The Court has jurisdiction over DrOwl because (among other things) DrOwl operates, conducts, engages in, and carries on business in Florida; and breached a contract in Florida by failing to perform an act required by the contract to be performed in this state.

6. Venue is proper in this district under 28 U.S.C. § 1391 because a substantial part of the events giving rise to the claims in this action occurred in this district.

7. In addition, pursuant to the Employment Agreement (defined below), the Parties agreed to venue "exclusively before a federal or state court sitting in Florida."

8. All conditions precedent to this action have occurred, have been performed by Nagda, or have been waived.

### GENERAL ALLEGATIONS

9. In or about May 2018, Nagda began talks with Arvind Raichur ("Raichur"), CEO of MrOwl.com, Inc. ("MrOwl") to invest in MrOwl. MrOwl created and maintains a social cloud storage software platform which allows users to store and share their content with others, as well as simultaneously search their cloud, computer files and internet all at the same time.

10. During his discussions with Raichur, Nagda originated and proposed the idea of leveraging the MrOwl platform in the healthcare industry by utilizing the platform to manage patient medical records, and brand it DrOwl.com. It was from these discussions that DrOwl was formed.

11. Nagda and Raichur continued to discuss the DrOwl company and on or about August 6, 2019, Nagda communicated to Raichur that he wanted to lead DrOwl as its CEO.

12. As a result of those discussions, Nagda entered into that certain Employment Agreement between DrOwl and Nagda, with an effective date of November 11, 2019 (the

"Employment Agreement"). *A true and correct copy of the Employment Agreement is attached hereto as* **<u>Exhibit A</u>**.[1]

13. Under the Employment Agreement, Nagda was employed as President of DrOwl reporting to Raichur, CEO of DrOwl, and Nagda's responsibilities were described only as "those customary for a President of a health tech start-up."

14. During his employment, Nagda was instrumental in the growth and development of DrOwl. For example, Nagda:

    a. had a direct and integral role in raising approximately $1.4M to $1.7M in capital for DrOwl;

    b. met with, discussed with, and/or introduced Raichur and DrOwl to approximately 30 individuals for purposes of raising capital;

    c. developed and/or assisted with the development of the DrOwl concept and solution and company strategies;

    d. provided the necessary healthcare expertise to DrOwl to develop the DrOwl solution;

    e. worked on several projects, including but not limited to, contributing significantly to the creation of the telemedicine product and the data aggregation/comprehensive health record function of the DrOwl solution;

    f. interviewed/met with linguistic consultant for translating healthcare terminology into "plain English" to enhance DrOwl user experience;

    g. communicated regularly via phone, email and text with Raichur and Becky Raichur, CTO of DrOwl, and other DrOwl personnel;

    h. traveled to DrOwl's offices in Albuquerque, New Mexico to attend meetings;

    i. attended meetings in Orlando on multiple occasions with Raichur and Becky Raichur to discuss DrOwl business;

---

[1] The terms of the Employment Agreement are deemed confidential by Defendant; therefore, a placeholder has been filed as Exhibit A, with notice to be provided to Defendant pursuant to Local Rule 1.11(d).

  j. assisted software development staff with development strategies, questions and concerns; and

  k. provided general oversight of the strategic development of DrOwl.

15. DrOwl benefitted from Nagda's efforts and employment as President of DrOwl in several ways, including, but not limited to, using Nagda's name, reputation and contacts to attract investors, receiving investments in DrOwl to fund the continued operation of the DrOwl business and development of the DrOwl solution, receiving Nagda's medical knowledge and expertise that DrOwl incorporated into the DrOwl solution to create, develop and enhance its products and services, and using Nagda's general business knowledge and expertise combined with Nagda's medical knowledge and expertise to develop goals, strategies, plans and budgets for DrOwl.

16. Nagda successfully helped to lead DrOwl during the COVID-19 global pandemic.

17. Pursuant to the Employment Agreement, Nagda was entitled to receive a salary of $300,000 per year.

18. Nagda's first year salary was to be payable in one lump sum on or around November 11, 2020.

19. However, on or about November 2019, DrOwl and Nagda mutually agreed to defer payment of his salary until no later than December 31, 2019, and Nagda agreed.

20. To date, DrOwl has not paid Nagda any of the salary to which he is entitled.

21. In addition, pursuant to the Employment Agreement, Nagda was also granted Class A Units and equity options for Class A units in DrOwl.

22. On November 11, 2019 (the "Effective Date"), DrOwl granted Nagda, without condition or restriction, 388,000 Class A Units in DrOwl (the "Initial Class A Units").

23. Further, on the Effective Date, DrOwl granted Nagda certain options to purchase Class A Units of DrOwl, deemed the "First Option," "Second Option" and "Third Option."

24. Except as otherwise described in the Employment Agreement, the vesting of the First Option, Second Option and Third Option (collectively, the "Options") is contingent upon Nagda remaining continuously employed by DrOwl from the Effective Date through the applicable vesting date.

25. On May 25, 2021, after Nadga worked approximately 18 months to help build DrOwl during a global pandemic, and without any prior warning that DrOwl was even considering terminating Nagda's employment, Nagda received a letter terminating the Employment Agreement (the "Termination Letter"). *A true and correct copy of the Termination Letter is attached hereto as **Exhibit B**.*[2]

26. Pursuant to the Termination Letter, DrOwl terminated Nagda's employment, allegedly "for Cause" pursuant to the Employment Agreement for "failure to perform his duties…as set forth under …. the [Employment Agreement]." The Termination Letter alleges that Nagda did not work "full time" and "has never even come remotely close to performing his duties specified within [the Employment Agreement]."

---

[2] The Termination Letter references provisions of the Employment Agreement which are deemed confidential by Defendant; therefore, a placeholder has been filed as Exhibit B, with notice to be provided to Defendant pursuant to Local Rule 1.11(d).

27. The Employment Agreement provides that in the event the Company terminates Nagda's employment for Cause, the Company's only obligation to Nagda is payment of his earned but unpaid base salary, up to the termination date.

28. Under the Employment Agreement, "Cause", can include:

    a. Failing and refusing to perform employment duties faithfully and diligently,

    b. Failing or refusing to comply with covenants, or

    c. otherwise failing to fulfill the terms of the Employment Agreement.

29. Pursuant to the Termination Letter, DrOwl, improperly and inaccurately, relied on "Cause" to eliminate the grant of the Initial Class A Units to Nagda and the Options.

30. Nagda disputes DrOwl's position that DrOwl had the right to terminate Nagda's employment "for Cause," and Nagda notified DrOwl of his dispute by correspondence dated June 25, 2021 (the "Response to Termination"), wherein Nagda also notified DrOwl of its breach of the Employment Agreement and demanded that DrOwl pay the amounts owed to him under the Employment Agreement and to confirm Nagda's ownership of the Initial Class A Units and rights in the Vested Options. *A true and correct copy of the Response to Termination is attached hereto as* **Exhibit C**.[3]

31. Nagda performed faithfully and diligently, the duties required of him under the Employment Agreement.

---

[3] The Response to Termination Letter references provisions of the Employment Agreement which are deemed confidential by Defendant; therefore, a placeholder has been filed as Exhibit B, with notice to be provided to Defendant pursuant to Local Rule 1.11(d).

32. At no time during the 18 months Nagda was employed by DrOwl, did Raichur, any member of the board of directors/managers of DrOwl, or any other person at DrOwl, express verbally, via email or text message to Nagda that there was any issue with the performance of his duties or that DrOwl was contemplating terminating him for any reason.

33. Therefore, Nagda's termination was necessarily "without Cause".

34. In addition to entitlement to Nagda's earned, but unpaid base salary, the Employment Agreement further provides that in the event termination is "without Cause", all of the Options immediately vest regardless of whether any criteria has been met.

35. Nagda was employed by DrOwl for approximately 18 months, at a salary of $300,000 per year. Therefore, Nagda is entitled to payment of approximately $450,000 in earned but unpaid base salary.

36. While Nagda agreed to defer payment of his salary, he in no way waived his rights to receive his salary.

37. Under the Employment Agreement, no failure to require compliance with a provision of the Employment Agreement shall be deemed a waiver of any provisions or conditions.

38. Further, Nagda is entitled to ownership of the Initial Class A Units, which were granted to him without restriction and were fully earned on the Effective Date.

39. Further, Nagda is entitled to ownership of any of the Options that vested prior to the termination of his employment with DrOwl.

40. In the event of a termination by DrOwl without Cause, all Options immediately vest; therefore, Nagda is entitled to retain the vested Options to purchase collectively 388,001 Class A Units in DrOwl.

41. Even if DrOwl had the right to terminate Nagda for Cause, Nagda would be entitled to retain the Options to purchase 194,001 Class A Units in DrOwl which would have vested as follows:

   a. As of the date of termination of Nagda's employment with DrOwl, the First Option was vested to the extent of 90,534 Class A Units in DrOwl; and

   b. Upon information and belief, prior to the date of termination of Nagda's employment with DrOwl, DrOwl received a valuation equal to or in excess of $125,000,000. Therefore, the Third Option was vested to the extent of 103,467 Class A Units in DrOwl.

42. DrOwl's termination of Nagda, whether without Cause or for Cause, in no way absolves DrOwl of its obligation to pay Nagda the earned salary owed to him, nor does it terminate or result in the forfeiture of, or give DrOwl the right to eliminate, Nagda's ownership of the Initial Class A Units or Nagda's rights in the vested Options.

43. DrOwl's failure to pay Nagda any salary to which he is entitled under the Employment Agreement and elimination of the Initial Class A Units and the vested Options constitute breaches of the Employment Agreement by DrOwl.

44. Nagda demanded payment of the earned and unpaid salary due to him, as well as the certificates or other documentation evidencing his ownership of the Initial Class A Units, and reinstatement of the vested Options in his Response to Termination.

45. On or about July 7, 2021, DrOwl responded ("DrOwl 7/7 Response") by indicating that "Dr. Nagda will not be rewarded for work unperformed." *A true and correct copy of the DrOwl 7/7 Response is attached hereto as **Exhibit D**.*

46. To date, DrOwl has failed and refused to pay Nagda the salary due to him, reinstate, or produce the certificates or other documentation evidencing his ownership of, the Initial Class A Units, or reinstate the vested Options.

47. The Employment Agreement entitles the prevailing party in any dispute arising from the Employment Agreement to its reasonable attorneys' fees and costs incurred in litigating the dispute.

48. Nagda has retained Iurato Law Firm, PL to prosecute this action and is entitled to recover from DrOwl reasonable attorneys' fees and costs for services rendered in connection herewith.

### COUNT I
### [BREACH OF EMPLOYMENT AGREEMENT]

49. Nagda realleges and incorporates by reference the allegations in paragraphs 1 through 48 above.

50. The Employment Agreement is a binding, enforceable, and valid contract.

51. Consideration was given by Nagda for the earned and unpaid salary, the Initial Class A Shares and the Options in the form of, among other things, the promises and covenants made by Nagda in the Employment Agreement and the services provided by Nagda to DrOwl.

52. Under the Employment Agreement, Nagda is entitled to his earned and unpaid salary of approximately $450,000.

53. Under the Employment Agreement, Nagda is entitled to the Initial Class A Units and the vested Options and DrOwl.

54. DrOwl granted Nagda, without condition or restriction, the "Initial Class A Units".

55. Further, on the Effective Date, DrOwl granted Nagda certain vested Options.

56. Under the Employment Agreement, Nagda is also entitled to reimbursement of work-related expenses and other benefits.

57. DrOwl has materially breached the Employment Agreement by:

   a. failing to pay Nagda the earned and unpaid salary due under the Employment Agreement;

   b. failing to reimburse Nagda for over $2,200.00 in work-related expenses;

   c. eliminating the Initial Class A Units and the vested Options; and

   d. wrongfully terminating the Employment Agreement for Cause", without the occurrence of one of the reasons specified in the definition of "Cause" in the Employment Agreement.

58. Nagda has been damaged by DrOwl's failure to pay Nagda the earned and unpaid salary due under the Employment Agreement, failure to reimburse Nagda for work-related expenses, and DrOwl's elimination of the Initial Class A Units and the vested Options.

59. Nagda has been further damaged by DrOwl's breach of the Employment Agreement for wrongfully terminating the Employment Agreement "for Cause", which has caused Nagda a loss of future wages and the opportunity for the full vesting of all Options.

WHEREFORE, Plaintiff, Krishan Nagda, M.D., respectfully requests the Court to award damages against DrOwl Technologies, Inc., plus pre and post-judgment interest, attorney's fees, and costs, and to award Nagda all other relief he is entitled to at law or in equity.

COUNT II
[CONVERSION]

60. Nagda realleges and incorporates by reference the allegations in paragraphs 1 through 48 above.

61. Nagda received and has an immediate right to possess and control the Initial Class A Units and vested Options in DrOwl, which in turn grants Nagda an immediate right to certain rights and benefits relating to DrOwl.

62. DrOwl has exercised the wrongful dominion or control over the Class A Units and vested Options to the detriment of and which, permanently or for an indefinite time, deprives Nagda of all rights and benefits of the Class A Units and vested Options.

63. DrOwl's Termination Letter unambiguously denies Nagda of his share ownership in DrOwl and clearly eliminates the grant of the Initial Class A Units to Nagda and the Options.

64. DrOwl's wrongful and unauthorized elimination of the grant of the Initial A Units to Nagda and the Options, and ultimate conversion of Nagda's Initial Class A Units and vested Options back to DrOwl, deny Nagda's share ownership permanently or for an indefinite time.

65. DrOwl's wrongful dominion or control and unauthorized acts seriously interferes with the immediate right of Nagda to control his Initial Class A Units and vested Options.

66. DrOwl's unauthorized acts go beyond and are independent from DrOwl's failure to comply with the terms of the Employment Agreement.

67. On June 25, 2021, Nagda demanded issuance of the certificates or other documentation evidencing his ownership in the Initial Class A Units, and reinstatement of the vested Options in the Response to Termination.

68. To date, DrOwl has refused to reinstate, or produce certificates or other documentation evidencing his ownership of the Initial Class A Units, and reinstate the vested Options, denying Nagda of his immediate possession or immediate right to possess same.

69. Nagda has been damaged by DrOwl's failure to reinstate, or produce certificates or other documentation evidencing his ownership of the Initial Class A Units and reinstate the vested Options.

WHEREFORE, Plaintiff, Krishan Nagda, M.D., respectfully requests the Court for judgment against DrOwl Technologies, Inc., for:

a) the immediate reinstatement and return of Nagda's Initial Class A Units and vested Options, evidenced by certificates or other documentation, and any rights, benefits;

b) interest, including pre and post-judgment interest, that Nagda is entitled resulting from his ownership of the Initial Class A Units and Vested Options;

c) reasonable attorney's fees, and costs that Nagda is entitled, and

d) all other relief Nagda is entitled to at law or in equity.

## COUNT III
### [UNJUST ENRICHMENT]

70. Nagda realleges and incorporates by reference the allegations in paragraphs 2 – 4, 6, 8 – 11, 14 – 16, 18 – 20, 22 – 23, 32 – 33, 35 – 36, 38 – 42, and 46.

71. Nagda conferred a benefit upon DrOwl when he had a direct and integral role in raising capital for DrOwl by meeting with potential investors and/or introducing potential investors to Raichur, developing and/or assisting in the development of the DrOwl concept and solution and company strategies, provided the necessary expertise to DrOwl in developing the DrOwl solution, facilitated the translation of healthcare terminology into "plain English" to enhance the DrOwl user experience, as well as other duties and responsibilities.

72. Nagda further conferred the benefit of his name, reputation and contacts upon DrOwl, to attract investors, as well as his medical knowledge and expertise in order to develop goals, strategies, plans and budgets for DrOwl.

73. DrOwl had knowledge of the benefit conferred by Nagda upon DrOwl during the 18 month period Nagda was employed by DrOwl.

74. DrOwl accepted and retained the benefit conferred by Nagda; however, DrOwl has failed to pay Nagda the salary owed to him for the 18 months he worked, and eliminated the Initial Class A Shares and vested Options, for which he is entitled.

75. It would be inequitable for DrOwl to retain the benefit conferred by Nagda to DrOwl without paying for it.

76. Nagda does not have an adequate remedy at law.

WHEREFORE, Plaintiff, Krishan Nagda, M.D., respectfully requests the Court to award Nagda damages against DrOwl Technologies, Inc., plus pre and post-judgment interest, and to award Nagda all other relief he is entitled to at law or in equity.

### COUNT IV
### [SPECIFIC PERFORMANCE]

77. Nagda realleges and incorporates by reference the allegations in paragraphs 1 through 48 above.

78. Nagda and DrOwl are parties to the Employment Agreement, which is a binding enforceable contract.

79. Nagda has performed his obligations under the Employment Agreement.

80. Pursuant to the Employment agreement, Nagda is entitled to the Initial Class A Units granted to Nagda as of the Effective Date and the retention of the Options granted to Nagda as of the Effective Date and vested as of the termination of Nagda's employment with DrOwl.

81. DrOwl has failed to reinstate, or produce certificates or other documentation evidencing ownership of, the Initial Class A Units evidencing and reinstate the vested Options, even after DrOwl's receipt of Nagda's Response to Termination wherein Nagda demanded DrOwl's performance of its obligations under the Employment Agreement.

82. As a privately held start-up company, DrOwl's Class A Units have not been listed on a publicly traded exchange and there is no market for DrOwl's Class A Units;

83. Because DrOwl is a privately held start-up company, DrOwl's Class A Units have a peculiar or unusual value that is not readily ascertainable, with incalculable growth potential, and therefore cannot be readily replaced;

84. Nagda's many contributions to DrOwl, including but not limited to, his knowledge and expertise in the medical field, his significant efforts as President of DrOwl, his fundraising efforts resulting in approximately $1.4M and $1.7M in capital for DrOwl, the key contacts he introduced to DrOwl and his efforts to improve the DrOwl solution, materially contributed to the incalculable growth potential of the Class A Units;

85. Nagda has no adequate remedy at law and justice requires specific performance in this instance.

WHEREFORE, Plaintiff, Krishan Nagda, M.D., respectfully requests the Court order DrOwl to perform its obligations under the Employment Agreement by:

a) Reinstating, or producing certificates or evidence of Nagda's ownership in, the Initial Class A Units granted to Nagda on the Effective Date;

b) Reinstating Nagda's vested Options;

c) and payment of the reasonable attorney's fees, and costs incurred by Nagda; and

e) grant all other relief Nagda is entitled to at law or in equity.

## COUNT V
### [PROMISSORY ESTOPPEL]

86. Nagda realleges and incorporates by reference the allegations in paragraphs 2 – 4, 6, 8 – 11, 14 – 16, 18 – 20, 22 – 23, 32 – 33, 35 – 36, 38 – 42, and 46.

87. DrOwl promised to reimburse Nagda for his deferred salary and expenses.

88. DrOwl encouraged Nagda to continue working for DrOwl despite DrOwl's failure to pay Nagda his salary and expenses incurred.

89. DrOwl should have reasonably expected that its promise to reimburse Nagda for his deferred salary and expenses would and did induce reliance by Nagda.

90. Nagda relied on DrOwl's promise to his detriment by reasonably relying on DrOwl's request to defer and promise to pay his salary no later than December 31, 2019, and forgoing other investment or work opportunities, including but not limited to, devoting full efforts to Brevard Inpatient Consultants, Inc. d/b/a Alliance of Physicians Against COVID, resulting in an approximate $200,000.00 loss.

91. Nagda changed his position to his detriment in relying on DrOwl's promise.

92. Injustice can be avoided only by enforcement of the promise.

WHEREFORE, Plaintiff, Krishan Nagda, M.D., respectfully requests the Court to award Nagda damages against DrOwl Technologies, Inc., plus pre and post-judgment interest, and to award Nagda all other relief he is entitled to at law or in equity.

DATED on August 17, 2021.

IURATO LAW FIRM, PL
*/s/ Jenay E. Iurato*
**JENAY E. IURATO, ESQ.**
Florida Bar No. 0521981
10012 N. Dale Mabry Hwy., Suite 213
Tampa, Florida 33618
Telephone: 813.898.2818
E-mail: jenay@iuratolawfirm.com
Alt: nicole@iuratolawfirm.com
Alt: kelly@iuratolawfirm.com
*Trial Counsel for Plaintiff*